IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**LAURIANNE MILLS, on behalf of**
**GENEA OLIVER,**

      **Plaintiff,**

vs.                                                               **No. 01cv0554 BB/JHG**

**JOANNE B. BARNHART,[1]**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

      This matter is before the Court on Plaintiff's (Mills') Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, to Remand for a Rehearing, filed December 26, 2001. The Commissioner of Social Security issued a final decision denying Mills' application for Supplemental Security Income benefits. Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds the motion to reverse is well taken and recommends that it be GRANTED.

      Mills filed her application for supplemental security income benefits on behalf of Genea Oliver (Genea) on October 21, 1993, alleging disability since September 24, 1993, due to attention deficit hyperactivity disorder (ADHD). The Commissioner denied Mills' application for supplemental security income benefits both initially and on reconsideration. On November 10,

---

[1] On November 9, 2001, Jo Anne B. Barnhart was sworn in as Commissioner of the Social Security Administration. Thus, she is substituted as Defendant in this action.

1994, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding Genea was not disabled. The Appeals Council denied Mills' request for review of that decision. Mills then filed a civil action in the United States District Court for the District of New Mexico. On May 6, 1997, the District Court entered its judgment, reversing the Commissioner's decision and remanded to the Appeals Council. Pursuant to the District Court judgment, the Appeals Council remanded for supplementary hearing before an ALJ. The ALJ held the supplementary hearing on October 30, 1997, and issued an unfavorable decision on February 27, 1998. Mills sought review of the decision before the Appeals Council. On September 1, 1998, the Appeals Council entered its order, remanding the case for supplementary hearing and reconsideration of specific issues set out by the District Court. The ALJ held a supplementary hearing on March 10, 1999. On May 21, 1999, the ALJ issued an unfavorable decision, finding Genea not disabled and denying benefits. Mills filed a Request for Review of the decision by the Appeals Council. On April 23, 2001, the Appeals Council denied Mills' request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Mills seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

A child under eighteen years of age is "disabled" if the child, "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). A sequential three-step process guides the Commissioner's determination of whether a child meets this criteria. The ALJ must determine, in this order, (1) that the child is not engaged in substantial gainful activity, (2) that the child has an impairment or combination of impairments that is severe, and (3) that the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Pt. 404, 20 C.F.R. § 416.924(a).

If a child's impairment or combination of impairments does not meet or medically equal a listed impairment, the agency will assess all of the functional limitations caused by the child's

impairment or combination of impairments. 20 C.F.R. § 416.926a(a). If the functional limitations caused by the child's impairments(s) are the same as the disabling functional limitations caused by a listed impairment, the agency will find that the child's impairment or combination of impairments is functionally equivalent in severity to a listed impairment. *Id.* The regulations provide four methods by which functional equivalence to a listed impairment may be established:

> (1) **Limitation of specific functions**. We may find that your impairment(s) is functionally equivalent in severity to a listed impairment because of extreme limitation of one specific function, such as walking or talking.
>
> (2) **Broad areas of development or functioning.** Instead of looking at limitation of specific functions, we may evaluate the effects of your impairment(s) in broad areas of development or functioning, such as social functioning, motor functioning, or personal functioning (i.e., self-care) and determine if your functional limitations are equivalent in severity to the disabling functional limitations in listing 112.12 or listing 112.02. If you have extreme limitations in one area of functioning or marked limitation in two areas of functioning, we will find that your impairment(s) is functionally equivalent in severity to a listed impairment.
>
> (3) **Episodic impairments**. If you have a chronic impairment(s) that is characterized by frequent illnesses or attacks, or by exacerbations and remissions, we may evaluate your functional limitations using the methods in paragraphs (b)(1) and (b)(2) of this section. However, your functional limitations may vary and we may not be able to use the methods in paragraphs (b)(1) and (b)(2) of this section. Instead, we may compare your functional limitation(s) to those in any listing for a chronic impairment with similar episodic criteria to determine if your impairment(s) has such a serious impact on your functioning over time that it is functionally equivalent in severity to one of those listings.
>
> (4) **Limitations related to treatment or medication effects**. Some impairments require treatment over a long period of time (i.e., at least a year) and the treatment itself (e.g., multiple surgeries) causes marked and severe functional limitations. Marked and severe functional limitations may also result from the combined effects of limitations caused by ongoing treatment and limitations caused by an impairment(s).

20 C.F.R. § 416.926a(b)(1)-(4). There is no set order in which the agency must consider these

methods, and the agency may not consider them all if it finds that a claimant's impairment(s) is functionally equivalent in severity to a listed impairment. 20 C.F.R. § 416.926a(b). However, the agency will consider all of the methods before it determines that a claimant's impairment(s) is not functionally equivalent in severity to any listed impairment. *Id.*

When the agency determines functional equivalence based on broad areas of development or functioning, the agency will evaluate the functional effects of a claimant's impairment(s) in several areas of development or functioning to determine if the claimant's functional limitations are equivalent in severity to the disabling functional limitations of listing 112.12 or listing 112.02. 20 C.F.R. § 416.926a(c). However, the agency refers to the areas of development or functioning described in paragraphs (c)(4) and (c)(5) of § 416.926a instead of referring to the areas of development or functioning in listings 112.12 or 112.02. *Id.* Paragraph (c)(4) describes the areas in general terms and paragraph (c)(5) as they apply to specific age groups. *Id.* If a claimant has "marked" limitations[2] in two areas of development or functioning, or "extreme" limitation[3] in one area, the agency will find that the claimant's impairment(s) is functionally equivalent in severity to listing 112.12 or listing 112.02, even if the claimant's impairment(s) is a physical impairment(s) or

---

[2] Marked limitation means: (A) when standardized tests are used as the measure of functional abilities, a valid score that is two standard deviations or more below the norm for the test (but less than three standard deviations); or (C) for children from age three to attainment of age eighteen, "more than moderate" and "less than extreme." Marked limitation may arise when several activities or functions are limited or even when only one is limited as long as the degree of limitation is such as to interfere seriously with the child's functioning. 20 C.F.R. § 416.926a(c)(3)(i)(A) & (C).

[3] Extreme limitation means: (A) When standardized tests are used as the measure of functional abilities, a valid score that is three standard deviations or more below the norm for the test; or (C) For children from birth to attainment of age 18, no meaningful functioning in a given area. There may be extreme limitation when several activities or functions are limited or even when only one is limited. 20 C.F.R § 416.926a(c)(3)(ii)(A) & (C).

a combination of physical and mental impairments. *Id.*

Paragraph (c)(5)(iv) applies to school-age children (age 6 to attainment of age 12). The areas covered for this age group are: (A) Cognition/communication functioning; (B) Motor functioning; (C) Social functioning; (D) Personal functioning; and (E) Concentration, persistence, or pace. *See* 20 C.F.R. § 416.926a(c)(5)(iv)(A)-(E).

In support of her motion to reverse, Mills makes the following arguments: (1) the ALJ improperly evaluated Genea's oppositional defiance disorder; (2) the ALJ's findings that Genea had a less-than-marked limitation in the areas of social and personal functioning are not supported by substantial evidence; (3) the ALJ's finding that Genea had a less-than-marked limitation in the area of concentration, persistence and pace is not supported by substantial evidence; and (4) the ALJ improperly used a "version of the prohibited sit and squirm test."

**Oppositional Defiance Disorder**

Mills contends the ALJ improperly evaluated Genea's oppositional defiance disorder. The Court agrees. On September 1, 1998, the Appeals Council remanded this case to the ALJ for further proceedings. Tr. 279. Specifically, the Appeals Council noted that the ALJ's February 27, 1998 Unfavorable Decision did not acknowledge Genea's impairments of oppositional defiant disorder, depression, and enuresis.[4] *Id.* The Appeals Council also noted that the 1998 Unfavorable Decision did not acknowledge Genea's placement in special education due to academic (learning disabled/language) and behavior (emotionally and behaviorally disturbed) issues. *Id.* The Appeals Council found that, because the ALJ had not fully addressed Genea's

---

[4] Enuresis is urinary incontinence; which may be intentional or involuntary but not due to a physical disorder. *Stedman's Medical Dictionary* 579 (26th ed. 1995).

impairments, he had not assessed the severity and effects of Genea's combination of impairments. *Id.* The Appeals Council then directed the case be reassigned to a new ALJ to give further consideration and to clarify the severity and effects of Genea's impairments. *Id.*

In his May 21, 1999 Decision, the ALJ acknowledged the Appeals Council directive and stated "However, the Appeals Council order of remand requires that, in addition to the effects of ADHD, I also consider evidence of record that the child has an oppositional defiant disorder (ODD), depression, and enuresis." Tr. 155. Citing to Exhibit 38 at 18, the ALJ then found that Genea had "merely demonstrated many of the symptoms of a child with an oppositional [sic] disorder." *Id.* Exhibit 38 (1 of 3) is a three page letter from Genea's counsel to the Office of Hearing and Appeals and does not contain the statement the ALJ relied upon. The ALJ then concluded that "[t]hese symptoms are commonly associated with ADHD and do not necessarily support a diagnosis of ODD." *Id.* The ALJ attributed this opinion to Dr. Geoffrey W. Sutton, Ph.D. and found the record did not support a finding that Genea was properly diagnosed with ODD as a separate, distinguishable mental impairment. The ALJ also relied on Dr. Tom Reichenbacher's 1994-95 progress notes and found that Dr. Reichenbacher had not noted any signs or findings to support a diagnosis of ODD. Ultimately, the ALJ found that the evidence did not support a separate diagnosis of ODD. *Id.* This finding is not supported by substantial evidence.

According to the *Diagnostic and Statistical Manual of Mental Disorders*, the diagnostic features of ODD are as follows:

> The essential feature of Oppositional Defiant Disorder is a recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward authority figures that persists for at least 6 months (Criterion A) and is characterized by the frequent occurrence of **at least four of the following behaviors**: losing temper (Criterion

> A1), arguing with adults (Criterion A2), actively defying or refusing to comply with the requests or rules of adults (Criterion A3), deliberately doing things that will annoy other people (Criterion A4), blaming others for his or her own mistakes or misbehavior (Criterion A5), being touchy or easily annoyed by others (Criterion A6), being angry and resentful (Criterion 7), or being spiteful or vindictive (Criterion 8).(emphasis added).
>
> Negativistic and defiant behaviors are expressed by persistent stubbornness, resistance to directions, and unwillingness to compromise, give in, or negotiate with adults or peers. Defiance may also include deliberate or persistent testing of limits, usually by ignoring orders, arguing, and failing to accept blame for misdeeds. Hostility can be directed at adults or peers and is shown by deliberately annoying others or by verbal aggression (usually without the more serious physical aggression seen in Conduct Disorder). Manifestations of the disorder are most invariably present in the home setting, but may not be evident at school or in the community. Symptoms of the disorder are typically more evident in interactions with adults or peers whom the individual knows well, and thus may not be apparent during clinical examination.

*See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 100 (4th ed. 2000)(DSM-IV). Moreover, ADHD is common in children with Oppositional Defiant Disorder. *Id.* 101.

In May of 1994, Dr. Sutton diagnosed Genea with ADHD. Tr. 242. Dr. Sutton also noted Genea "also demonstrates **many of the symptoms** of a child with an oppositional [defiant] disorder." *Id.* (emphasis added). On September 24, 1994, Dr. Reichenbacker noted Genea "still continued to be oppositional at home often not responding to questions which she did to me today." Tr. 223. Again on December 6, 1994, Dr. Reichenbacher noted Genea "gets into arguments with her older brother about toys that they both want and she was somewhat oppositional today but could be redirected." Tr. 219. Dr. Reichenbacher noted on January 11, 1995, that Genea was "less oppositional," "looking somewhat angry" at the time of the visit and assessed her as having "Attention deficit hyperactivity disorder; oppositional defiant disorder; and enuresis." Tr. 218. Finally, on December 2, 1998, Dr. Robert L. Karp, an agency consultant and

a psychiatrist, found "This young lady, for about the past five years, has had almost all of the symptoms of attention deficit hyperactivity disorder and a number of symptoms of oppositional deficant disorder." Tr. 306. Dr. Karp's clinical impression was that Genea suffered from ADHD and ODD.[5] *Id*. The ALJ may not substitute his own opinion for Dr. Karp's medical opinion. *See Sisco v. United States Dep't of Health and Human Services*, 10 F.3d 739, 744 (10th Cir. 1993). Accordingly, the ALJ's finding that the evidence did not support a separate diagnosis of ODD is not supported by substantial evidence.

**Social and Personal Functioning**

Mills also contends the ALJ's findings that Genea had a less-than-marked limitation in the areas of social and personal functioning are not supported by substantial evidence. In his Decision, the ALJ found Genea continued to have a marked deficit in the area of cognition/communication. *See* 20 C.F.R. § 416.926a(c)(4)(i) & 416.926a(c)(5)(iv)(A). Tr. 160. However, the ALJ found "no evidence that the child has limitations in the motor skills area of function. *See* 20 C.F.R. 416.926(c)(5)(iv)(B). Tr. 160. As to the area of social skills the ALJ found "some conflict in the evidence." *Id.* Relying on Dr. Karp's December 2, 1998 Comprehensive Psychiatric Consultation, the ALJ found that "although the child has some limitations in social skills, her limitations are less than marked." *See* 20 C.F.R. § 416.926a(c)(4)(iii) & § 416.926a(c)(5)(iv)(C).[6]

---

[5] Dr. Karp also assessed Genea as having serious symptoms and serious impairment in school functioning. Tr.

[6] Social functioning (age 6 to attainment of age 12): Your ability or inability to play alone, with another child, and in a group; to initiate and develop friendships; to respond to your social environments through appropriate and increasingly complex interpersonal behaviors, such as empathizing with others and tolerating differences; and to relate appropriately to individuals

9

Dr. Karp, a consultative psychiatrist, relying on Genea and her mother, reported the following in his consultative report:

> She often has difficulty waiting her turn and often interrupts or intrudes on others. Mother also noted that Genea doesn't lose her temper much, and doesn't argue much with adults, but sometimes actively defies or refuses to comply with adults (sic) requests for rule (sic), and often deliberately annoys people, sometimes she is often touchy or easily annoyed by others. She usually isn't very angry, resentful, spiteful, or vindictive.

Tr. 304. Genea and her mother also reported to Dr. Karp that Genea had "lots of friends." *Id.* Significantly, in a Multidisciplinary Evaluation Report dated December 16, 1994, Genea's teachers reported she had "problems with social skills." Tr. 239-40. The report is specific as to the behaviors that reflect Genea's problem in this domain. Specifically, the teachers reported Genea "bothers others who are working and gets into trouble at recess due to name calling and hitting." Tr. 240. The Multidisciplinary Report also indicated that Genea's Kindergarten and First Grade teachers reported Genea "has poor social skills." Tr. 242. Under the category of <u>Behavior Evaluation</u>, "[a]ll of the raters agree that Genea's behavior in this area is certainly serious and demonstrates significant behavior deviance from what is normally expected of children her age." Tr. 242. The report further reported "Inability to build or maintain appropriate relationships with peers and teachers exhibited over a long period of time." Tr. 243. This conclusion was based on "Both of Genea's teachers (kindergarten and 1st grade) from two different schools, and Genea's parents' report that Genea has significant problems in the area of

---

and in group situations (e.g., siblings, parents or caregivers, peers, teachers, school classes, neighborhood groups). 20 C.F.R. § 416.926a(c)(5)(iv)(C).

peer relations. In addition, "some of Genea's sentence completion responses[7] also suggeste[d] that she understands that she has peer problems." *Id.*

On February 25, 1995, A Communication Evaluation Report completed by a speech-language pathologist (SLP) indicated Genea was referred for testing by the IEP Committee because "Genea behaves inappropriately socially and bothers other children who are working." Tr. 248. The SLP opined that "[Genea] experienced significant difficulty with problem solving/critical thinking skills which may account, at least in part, for her inappropriate social behavior." Tr. 251. It was the impression of the SLP that "improvement in skills such as problem solving and vocabulary could have a positive effect on social skills as well as acedemics." *Id.*

On January 29 and 30th, 1998, an Evaluation Specialist evaluated Genea and noted in her report that Genea's special education teacher opined that Genea "continues to exhibit a need for one-on-one supervision for behavior and academics." Tr. 300. The Evaluation Specialist also noted Genea's "behaviors also continue to be a major issue." *Id.* The Evaluation Specialist found Genea continued to meet the criteria for special education services as a seriously emotionally/behaviorally disturbed student." *Id.*

On March 11, 1998, the IEP Committee held a meeting to reevaluate Genea's needs. At that time, the Committee found Genea was "seriously emotionally/behaviorally disturbed." Tr. 282 (*see also,* Tr. 296, 297). The Committee also noted Genea had "remained at Wherry Elementary School since 1995" and "has continued to receive special education services to meet her needs in behavior, social skills, academics and language." Tr. 283. Genea's special education

---

[7] For example, Genea responded as follows: (1) It makes me sad to "hit on my friends;" (2) If I only knew "why my friends are not mean to me;" and (3) I would like most to "be nice to my friends." Tr. 243.

11

teacher noted that she had known Genea for three years, evaluated her and reported that "Genea continues to hit people/touch people, has inappropriate behaviors to others in spite of repeated warnings from adults and peers." Tr. 284. The teacher further noted "Genea needs instruction for improving social skills." *Id.* The IEP Committee opined that Genea continued to need "one-on-one supervision in the area of behavior" and needed "close monitoring and clear-cut guidelines to look at appropriate behaviors." Tr. 285. Functioning under this one-on-one setting, Genea made progress in the area of behavior. Tr. 292.

Finally, at the administrative hearing Genea testified she sometimes didn't get along with her teacher (Tr. 321), had gotten into trouble with the bus driver because she did not mind her, did not pay attention, did not sit in her seat forward, did not get on when she was supposed to (Tr. 323), and got in trouble in school for not doing her work, for fighting with another person, for not getting along with others (Tr. 323). Genea further testified she fought with other kids "a lot" and did not get along with them. Tr. 323. She reported she did not get along with others because they called her names or didn't like her race or "things like that." Tr. 324. Genea's mother also testified. Ms. Mills testified Genea had a hard time with friends. Tr. 327. Based on the record as a whole, the Court finds that the ALJ's finding that Genea's limitation in the area of social skills was "less than marked" is not supported by substantial evidence.

Relying on Ms. Mills' description of Genea's daily activities, the ALJ also found Genea did not have any limitations in the area of personal functioning. Tr. 161. On December 1, 1998, Ms. Mills reported to Dr. Karp that Genea:

> [S]he usually gets up at about 7:00, dresses and goes to school, walks to the school bus, spends the day at school and the afternoon, often being at Homework Club, and reading and playing games, taking a special course in sign language, and being in chorus three times a week. Then she takes the bus home, and plays with

12

friends for a few hours, and watches TV in the evening with her family.
Tr. 304. These activities of daily living indicate that Genea was functioning adequately. Accordingly, substantial evidence supports the ALJ's finding that Genea did not have any limitations in the area of personal functioning.

**Concentration, Persistence or Pace**

Ms. Mills also contends the ALJ's finding that Genea had a less-than-marked limitation in the area of concentration, persistence or pace[8] is not supported by substantial evidence. The ALJ found that while Genea was on medication her limitations in this domain were less than marked. The ALJ also found Ms. Mills not credible in "her descriptions of her daughter's behavior." Tr. 162. The ALJ relied on Genea's demeanor at the administrative hearing noting "During the hearing, Genea was well behaved and appropriately quiet. I did not observe the fidgeting, squirming, or signs of excessive energy Ms. Dewy (Ms. Mills) has described. Genea appeared to have no difficulty remaining quiet or attending to the proceedings." Tr. 162.

However, on April 10, 1995, while on medication, Genea's special education teacher noted "Genea has made positive academic progress yet she has the skill and ability to accomplish much more. Genea's lack of impulse control and distractibility hinders her progress. Because of Genea's lack of focus and maturity she is unable to function successfully in the general class environment at this time." Tr. 232. On December 2, 1998, Dr. Karp's report noted Ms. Mills complaints that "even on medicine," Genea was very easily distracted by outside stimuli, occasionally fidgeted with her hands and feet or squirmed in her seat, and sometimes left her seat

---

[8] Concentration, persistence, or pace (age 6 to attainment of age 12): Your ability or inability to engage in an activity, and to sustain the activity for a period of time and at a reasonable pace. 20 C.F.R. § 416.926a(c)(5)(iv)(E).

13

in the classroom when she was not supposed to, "although it happened less on the medicine." Tr. 303. Ms. Mills further reported Genea ran and climbed excessively in situations when it may be inappropriate, had difficulty playing quietly, was often on the go, and talked excessively all of the time at home. *Id.* Genea was also referred for a speech evaluation because of concerns about oral language and behavior, specifically "a short attention span." Tr. 248.

On December 16, 1994, the diagnostician noted that Genea's teachers had reported that Genea had "difficulties with extreme distractability, short attention span, and an inability to concentrate." Tr. 242. This was after a new medication was prescribed because "the current medication did not seem to be 'sufficiently effective to treat the severity' of Genea's symptoms." Tr. 239.

On May 10, 1995, Genea was seen at the 377th Medical Group on Kirtland, Air Force Base. Tr. 214. At that time, Ms. Mills reported Genea had been on Ritalin but she could not tell if it helped much. *Id.* On April 10, 1997, the IEP Committee opined that "Genea's academic and behavioral issues [were] best met in a special education classroom." Tr. 236. The Committee further opined that "A general education environment would not provide the instruction, repeated directions and the extensive supervision Genea needed." *Id.* Based on the record as a whole, the evidence indicates that Genea continues to have serious problems with concentration, persistence and pace even when she is on medication and even in a highly structured and controlled class environment. Therefore, the ALJ's finding that Genea had a less-than-marked limitation in the area of concentration, persistence and pace is not supported by substantial evidence.

This case was filed in 1993, has been heard by two ALJs, has been remanded by the United States District Court, three administrative hearings have been held, and the record has

been fully developed  Accordingly, the Court finds no basis for remanding this case for further proceedings.  *See Frey v. Bowen*, 816 F.2d 508, 518 (10th Cir. 1987).  The Court finds that Mills' Motion to Reverse and Remand for Payment of Benefits should be granted.

## RECOMMENDED DISPOSITION

The ALJ did not apply correct legal standards and his decision is not supported by substantial evidence.  Mill's Motion to Reverse and Remand for Payment of Benefits should be granted.

**JOE H. GALVAN**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE

Within ten days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to 28 U.S.C. § 636 (b)(1), file written objections to such proposed findings and recommended disposition. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.